FILED
COURT OF APPEALS
DIVISION II

2015 FEB 10 AM 8:57

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45115-8-II |
| Respondent. | |
| v. | |
| MICHAEL T. JACKSON, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Michael Jackson appeals his jury trial conviction of assault in the second degree. He argues that the court violated his Confrontation Clause rights as well as the evidentiary rules by admitting a hospital record containing statements from non-testifying treatment personnel; the trial court abused its discretion by continuing the trial beyond the time for trial period; the trial court erroneously refused to instruct the jury on the lesser included offense of assault in the fourth degree; the prosecutor committed misconduct in his closing argument; counsel was ineffective by failing to adequately argue the Confrontation Clause issue; and the trial court erred by ordering Jackson to pay costs. We accept the State's concession on the last issue and remand with instructions to vacate the domestic violence assessment costs and the contributions to the expert witness fund and special assault unit. In all other respects, we affirm.

## FACTS

Alexandria Siefert, while seated with her fiancé in his car, observed Jackson attempting to push Amber L. Lindsey into traffic. Jackson chased Lindsey across the street. He caught up to her, grabbed her by the hair, bashed her face against a telephone pole, and then choked her with both hands. Lindsey entered Siefert's fiancé's car after Siefert's fiancé opened the car door. Jackson grabbed Lindsey's hair and tried to pull her from the car. Siefert's fiancé began to drive

away, and Jackson was momentarily dragged along before he released Lindsey's hair. Jackson yelled obscenities at the departing car.

Immediately thereafter, Lindsey was crying and shaking and yelling "Oh, my god. Oh, my god." Report of Proceedings (RP) (June 5, 2013) at 447. "[T]here was a lot of blood everywhere." RP (June 5, 2013) at 447. Siefert and her fiancé took Lindsey to the hospital.

At the hospital, Lindsey told a triage nurse that "'My ex boyfriend (Michael) just beat me up on the side of the road.'" Ex. 12A, at 104.[1] Lindsey added that "she was pushed into a wooden pole hitting the back of her head, he tried to strangle her, pulled her hair and '[p]ushed my head into stuff.'" Ex. 12A, at 105. The triage nurse did not testify.

Dr. Timothy Dahlgren examined Lindsey, who told him that her "exboyfriend had grabbed her and pushed her to the ground such that she struck the back of her head on the ground" and that "he pushed her face against the hinge of the car or against the car, which is the part that caused the laceration." RP (June 5, 2013) at 374. Dr. Dahlgren testified that he needed Lindsey's information about her injuries to help determine if Lindsey could safely leave the hospital, or if Lindsey needed "access to help to protect them in the future." RP (June 5, 2013) at 375.

Dr. Dahlgren sutured the three-centimeter laceration Lindsey suffered from the assault. Dr. Dahlgren testified that based on his experience, if one looked closely enough, "there would always be a scar" from such a suturing. RP (June 5, 2013) at 377. But Dr. Dahlgren testified on cross-examination that he had not seen Lindsey since treating her, and had no way of knowing what kind of a scar she might have.

---

[1] Exhibit 12A was designated to this court as clerk's papers. The exhibit page number reflects the designated clerk's papers page number.

2

Dr. Dahlgren also referred Lindsey to a social worker. Lindsey told the social worker that Jackson had "hit her in the face/head and hit her head against a street sign or pole." Ex. 12A, at 111. The social worker referred Lindsey's case to law enforcement for "possible abuse/neglect/violence." Ex. 12A, at 110. The social worker did not testify.

Officer Jonathan Meador met briefly with Lindsey. He observed the large cut on her forehead and her ten stitches. He then located Jackson and spoke with him. Jackson gave inconsistent accounts of what happened. First, Jackson claimed that he had not seen Lindsey at all that day. Then, Jackson claimed in his written statement that he and Lindsey had been going to do laundry when Lindsey stopped to speak with an acquaintance in a car, and bumped her head on the doorframe.

The State charged Jackson with assault in the second degree with a domestic violence enhancement.[2]

## PROCEDURAL HISTORY

I.     TIME FOR TRIAL

Jackson's arraignment occurred on February 20, 2013, and trial was set for April 15, 2013. On April 11, 2013, the State requested a three-week continuance because Siefert was going to be working in Montana until May 6, 2013. Jackson objected on the grounds that Siefert was not a necessary witness because she was merely a passerby. The trial court disagreed, finding good cause to continue the trial to May 5, thus extending the time for trial deadline to June 5. *See* CrR 3.3(b)(5).

---

[2] RCW 9A.36.021(1)(a); RCW 10.99.020.

On May 6, the State moved for a second continuance because Officer Meador would be unavailable until the end of May because of out-of-state military training. Again Jackson objected, requesting a "discussion . . . to find out whether or not this could have been avoided." RP (May 6, 2013) at 5. The trial court rejected Jackson's argument and continued the trial to June 3. Trial commenced on that date, within the time for trial deadline.

II. TRIAL

The State relied on the testimony of Dr. Dahlgren, Siefert and Officer Meador. Lindsey, the triage nurse, and the social worker to whom Lindsey spoke did not testify. Over Jackson's objection, the State introduced, and the court admitted, a hospital record that contained the triage nurse's and social worker's notes. Jackson did not testify and he raised a defense of general denial.

At trial, Jackson proposed a jury instruction on the inferior degree offense of assault in the fourth degree. He argued that no evidence existed to show that Lindsey's injury was "substantial." RP (June 5, 2013) at 484. The trial court rejected the instruction, ruling that the defense failed to present evidence "affirmatively establish[ing] the defendant's theory of the case." RP (June 5, 2013) at 485.

During closing arguments, the prosecutor addressed Lindsey's failure to testify, telling the jury that it "heard her voice" through Siefert's and Dr. Dahlgren's testimony.[3] RP (Jun. 6, 2013) at 513. The prosecutor further added that victims of domestic violence in general need to be heard:

> One of the jurors asked me during voir dire, you know, if the complaining witness of a crime did not testify, why would we be in court? You know, why would we be here? Okay. Well, the answer is because victims of domestic violence need a voice. They do. Even when they're not potentially strong enough to stand up on their own, they need someone to stand up for them. And that's why we're here today. You didn't hear from the victim, but you did hear her voice.

---

[3] Jackson did not object to this line of argument, except as to the prosecutor's reference to Lindsey as the "victim." RP (June 6, 2013) at 527, 562. Jackson does not raise that issue on appeal.

4

RP (June 6, 2013) at 527-28. The prosecutor also explained the concept of reasonable doubt to the jury using the example of knowing that the world is round:

> And we all agree that no one had ever been to space, no one had actually observed the earth being round. But we had a common sense appreciation of the fact. We all agreed that because of that, we were satisfied beyond a reasonable doubt that the earth is round. All right. That's how you need to think about the proof in this case, having a common sense appreciation of the facts.

RP (June 6, 2013) at 515. The prosecutor further argued that "trying to concoct a scenario where the defendant did not commit this crime would be as unrealistic as trying to concoct a scenario where I am not an attorney." RP (June 6, 2013) at 567. Jackson did not object to these statements.

In rebuttal, the prosecutor argued that Jackson's closing argument left him "at a loss for words." RP (June 6, 2013) at 563. Jackson timely objected to this statement, but the court overruled the objection and the prosecutor continued to contradict Jackson's closing argument that implied Lindsey and Siefert had been "reckless." RP (June 6, 2013) at 564. The prosecutor told the jury that "[f]or someone to sit here and tell you that the victim was reckless in this crime . . . or that the people who helped her were reckless, I hope that leaves you at a loss for words as well." RP (June 6, 2013) at 565.

The jury convicted Jackson of assault in the second degree, but hung on the issue of whether Jackson and Lindsey had been members of the same family or household. At sentencing, the court ordered Jackson to pay $1,135 in fees for his court-appointed attorney, a $100 domestic violence assessment, a $100 contribution to the Kitsap County expert witness fund, and a $500 contribution to the Kitsap County special assault unit. Jackson appealed his conviction.

ANALYSIS

I.   STATEMENTS OF NON-TESTIFYING NURSE AND SOCIAL WORKER

Jackson argues that the trial court violated ER 802 and his Sixth and Fourteenth Amendment rights to confront adverse witnesses when it admitted the notes of the nurse and social worker who treated Lindsey. The State argues that the court properly admitted the notes because they were not testimonial and they fell within the business records exception to the hearsay rule. We agree with the State and uphold the trial court.

A.   ER 802

Jackson argues that the nurse's and social worker's notes constituted inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible "except as provided by these rules, by other court rules, or by statute." ER 802. One exception to hearsay includes statements made for purposes of medical diagnosis or treatment. ER 803(a)(4). The availability of the declarant is immaterial to the admission of these statements. ER 803(a)(4). In addition, RCW 5.45.020, the Uniform Business Records as Evidence Act, provides that:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

We review a trial court's decision to admit evidence pursuant to a hearsay exception for abuse of discretion. *State v. Woods*, 143 Wn.2d 561, 595, 23 P.3d 1046 (2001). A trial court's decision to admit or exclude business records under RCW 5.45.020 "is given great weight and will not be reversed unless there has been a manifest abuse of discretion." *State v. Ziegler*, 114 Wn.2d

533, 538, 789 P.2d 79 (1990). A manifest abuse of discretion occurs only when "no reasonable trial court would have ruled as the trial court did." *State v. Embry*, 171 Wn. App 714, 736, 287 P.3d 648 (2012).

Here, Lindsey's hospital record included her statements to the nurse and the social worker. Dr. Dahlgren, the treating physician, testified to the identity and the mode of preparation of the record. The hospital record was made in the ordinary course of the hospital's business, and was "generated contemporaneously with the treatment of the patient." RP (June 5, 2013) at 356. Finally, the trial court ruled that the source and method of preparation justified the admission of the hospital record, pointing to the "likelihood that the records are trustworthy." RP (June 5, 2013) at 343.

We hold that the factors of RCW 5.45.020 were met and that because the court properly admitted Lindsey's hospital record as a duly authenticated business record, it did not abuse its discretion.

B.      Confrontation Clause

A Confrontation Clause analysis is separate from analysis under the rules of evidence. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We review an alleged violation of the Confrontation Clause de novo. *State v. Hurtado*, 173 Wn. App. 592, 598, 294 P.3d 838 (2013). A Confrontation Clause claim may be raised for the first time on appeal if it arises to the level of a manifest error affecting a constitutional right. *State v. Kronich*, 160 Wn.2d 893, 899-901, 161 P.3d 982 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 271 P.3d 876 (2012); RAP 2.5(a)(3).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee an accused person the right to confront adverse witnesses. U.S. CONST. Amends. VI, XIV. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54. A statement is testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). The State bears the burden to establish that a statement is non-testimonial and thus admissible absent an opportunity to cross-examine. *Hurtado*, 173 Wn. App. at 600.

The Washington courts have repeatedly reaffirmed that a statement made for the purpose of medical diagnosis or treatment is not testimonial for Confrontation Clause purposes. *State v. Sandoval*, 137 Wn. App. 532, 538, 154 P.3d 271 (2007); *State v. Saunders*, 132 Wn. App. 592, 603, 132 P.3d 743 (2006); *State v. Fisher*, 130 Wn. App. 1, 13-14, 108 P.3d 1262 (2005); *State v. Moses*, 129 Wn. App. 718, 730, 119 P.3d 906 (2005); *see also Michigan v. Bryant*, __ U.S. __, 131 S. Ct. 1143, 1157 n.9, 179 L. Ed. 2d 93 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Giles v. California*, 554 U.S. 353, 376, 128 S. Ct 2678, 171 L. Ed. 2d 488 (2008). This proposition is true even when, as here, the statement inculpates a person who inflicts injury on the patient. *See Sandoval*, 137 Wn. App. at 538. The rationale is that a medical professional may wish to "recommend counseling or escape from the dangerous domestic environment as part of a treatment plan." *Saunders*, 132 Wn. App. at 608.

Jackson argues that the above cases are distinguishable because the medical professionals in those cases testified, and the social worker and triage nurse here did not. Jackson argues that it is the statements of the absent social worker and triage nurse *themselves*, rather than Lindsey's

8

statements to these people, that violated the Confrontation Clause. But the identity of the speaker does not alter either the reliability of the statements or their primary purpose: to assist the treating physician to best determine a course of medical treatment that will best protect the patient from further harm. The social worker and triage nurse entered their notes into the hospital record not to facilitate Jackson's prosecution, but in order to "prevent recurrence and future injury." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007). This non-testimonial purpose remained constant whether Lindsey made the statements or the social worker or triage nurse repeated her words. Nothing in the record raises any inference that the triage nurse's and the social worker's statements in the hospital record were made for any purpose other than assessment and treatment. The Confrontation Clause did not bar the admission of the hospital record. We reject Jackson's claim and uphold the trial court.[4]

II. TIME FOR TRIAL

Jackson argues that the trial court violated the time for trial rule[5] by granting continuances of the trial without inquiring whether the State had exercised due diligence in securing the attendance of its witnesses. The State argues that Jackson failed to create a record that the State had not been diligent, or to show that the defense would be prejudiced. We agree with the State.

---

[4] Even if the trial court violated the Confrontation Clause, the error was harmless. We look to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). Here, the untainted testimony of Siefert and Dr. Dahlgren established that Jackson physically struck Lindsey at least once, and that Lindsey was left with a severe laceration on her forehead immediately afterward. Furthermore, Jackson's untainted statements were so contradictory as to discredit Jackson's account of the incident. The weight of this evidence overwhelmingly establishes Jackson's guilt, making any Confrontation Clause violation harmless.

[5] CrR 3.3.

The application of the time for trial rule to a given set of facts is a question of law that we review de novo. *State v. Lackey*, 153 Wn. App. 791, 798, 223 P.3d 1215 (2009). Yet the decision to grant or deny a motion for a continuance rests within the sound discretion of the trial court. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004).

CrR 3.3(b)(1) requires an accused person who is in custody to be brought to trial within 60 days of arraignment. The court may continue the trial date "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). The continuance tolls the time for trial period. CrR 3.3(e)(3). Because Jackson's trial occurred on June 3, within the *first* extension of the time for trial, we review only the first order of continuance.

"When a witness is absent, a continuance should be granted only if the party seeking the continuance has exercised due diligence in securing the attendance of the witness." *City of Seattle v. Clewis*, 159 Wn. App. 842, 847, 247 P.3d 449 (2011).[6] Due diligence requires the proper issuance of subpoenas to essential witnesses. *Clewis*, 159 Wn. App. at 847. Here, although the record does not show whether the State served a subpoena on Siefert, copies of the State's subpoena are contained therein. Jackson contends the absence of a signature or return on the subpoena means the State failed to exercise due diligence. We note, however, that in the trial court, Jackson objected to the continuance solely on the basis that Siefert was not a necessary witness. We will not review the alleged failure to subpoena a witness for the first time on appeal. *Clewis*, 159 Wn. App. at 848.

---

[6] We note that the "due diligence" language is from a case that occurred prior to the amendment of CrR 3.3. For purposes of this case, we need not decide whether its viability continues under the amended rule. Neither party briefed it.

10

By failing to timely raise the State's alleged failure to subpoena Siefert, Jackson failed to preserve the issue for review. The trial court did not abuse its discretion by granting the first continuance, and Jackson's trial was timely. We uphold the trial court.

III.    INFERIOR DEGREE INSTRUCTION

Jackson argues that the court erred by not instructing the jury on the inferior degree offense of assault in the fourth degree. The State argues that no factual basis existed to instruct on the inferior degree offense because the evidence did not support a finding that only assault in the fourth degree was committed. We agree with the State.

A.      Statutory Rights

A defendant has an "'unqualified right'" to have an inferior degree offense passed upon by the jury. *State v. Parker*, 102 Wn.2d 161, 163, 683 P.2d 189 (1984) (quoting *State v. Young*, 22 Wash. 273, 276-77, 60 P. 650 (1900)); RCW 10.61.003, .010. This right is not subject to harmless error analysis. *Parker*, 102 Wn.2d at 164.

An instruction on an inferior degree offense is properly administered when

> "(1) the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense."

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)) (internal quotations omitted). This test contains a legal component and a factual component. *Fernandez-Medina*, 141 Wn.2d at 454-56. The parties agree that the legal component of the test is satisfied. Therefore, only the factual prong is at issue.

11

The factual prong of the test requires evidence which "raise[s] an inference that *only* the lesser included/inferior degree offense was committed to the exclusion of the charged offense." *Fernandez-Medina,* 141 Wn.2d at 455 (emphasis in original). In other words, the evidence must "permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater." *State v. Warden,* 133 Wn.2d 559, 563, 947 P.2d 708 (1997). "[T]he evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." *Fernandez-Medina,* 141 Wn.2d at 456. We view the evidence in the light most favorable to the party requesting the inferior degree instruction. *Fernandez-Medina,* 141 Wn.2d at 455-56.

A person is guilty of assault in the fourth degree "if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another." RCW 9A.36.041. Jackson was charged under RCW 9A.36.021(1)(a), which proscribes "[i]ntentionally assault[ing] another and thereby recklessly inflict[ing] substantial bodily harm." Substantial bodily harm is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.03.01, at 26 (3rd ed. 2008). Therefore, Jackson is entitled to an inferior degree instruction if the evidence raised an inference that he only committed assault in the fourth degree, i.e. that Lindsey did not suffer substantial bodily harm.

Even viewed in the light most favorable to Jackson, the evidence fails to establish that Lindsey did not suffer substantial bodily harm. She suffered a three-centimeter long laceration on her forehead that required ten stitches to close. She lost a large amount of blood. The responding

12

officer immediately saw Lindsey's injury. The evidence unequivocally established that Lindsey suffered a substantial disfigurement.

Jackson argues that Dr. Dahlgren did not know whether Lindsey's scar still existed or would be visible. However, this argument misses the point. The definition of substantial bodily harm does not require a permanent injury. A temporary injury is sufficient if it is substantial. Because the evidence unequivocally established that Lindsey had a "temporary but substantial disfigurement," the evidence failed to raise the inference that only assault in the fourth degree was committed. RCW 9A.04.110(4)(b). We reject Jackson's claim and uphold the trial court.

B.      Due Process Rights

Jackson raises the alternative argument that state and federal due process rights entitled him to an inferior degree offense instruction. U.S. CONST. amend. XIV; CONST. art. I, § 3. We reject his claim.

Although he invokes both the state and federal constitutions, Jackson asks only that we apply the "traditional federal standard for evaluating procedural due process claims." Br. of Appellant at 25 n.10. Federal due process "requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982) (emphasis in original). As previously articulated, the evidence did not warrant an inferior degree instruction. Instead, by unequivocally establishing substantial bodily harm, the evidence precluded instructing on assault in the fourth degree. Jackson was not entitled to an inferior degree offense instruction under either RCW 10.61.010 or the constitution.

13

IV.    PROSECUTORIAL MISCONDUCT

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995). Generally, the prosecutorial misconduct inquiry consists of two prongs: "(1) whether the prosecutor's comments were improper; and (2) if so, whether the improper comments caused prejudice." *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). The defendant bears the burden of showing that the prosecutor's remarks were both improper and prejudicial in the context of the record and all the circumstances of trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

Jackson alleges three improper comments by the prosecutor. The defendant timely objected to one of them. That comment will be discussed first, followed by the other two comments Jackson did not object to.

A.    Disparaging Defense Counsel

It is misconduct for the prosecutor to impugn the role or integrity of defense counsel. *Lindsay*, 180 Wn.2d at 431-32. For example, a prosecutor commits misconduct by referring to the defense's case as "bogus" or involving "sleight of hand" because such language implies "wrongful deception or even dishonesty in the context of a court proceeding." *State v. Thorgerson*, 172 Wn.2d 438, 451-52, 258 P.3d 43 (2011). Similarly, a prosecutor commits misconduct by referring to the defense's closing argument as a "crock." *Lindsay*, 180 Wn.2d at 433-34.

Here, the prosecutor argued in rebuttal that Jackson's closing argument had left him "at a loss for words" and that the jury should feel the same way. RP (June 6, 2013) at 563, 565. This argument suggested that the defense's closing argument should cause outrage in a reasonable

person. The prosecutor impugned defense counsel by implying that the defense's theory was not only incorrect, but shameful. We hold that the prosecutor's comment was improper.

We next examine the issue of prejudice. To demonstrate prejudice, Jackson must show a substantial likelihood that the prosecutor's statements affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). A prosecutor's improper comments may not be grounds for reversal if they were specifically provoked by defense counsel. *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006).

Here, defense counsel provoked the prosecutor's statements when he argued that Siefert's fiancé had acted unsafely when he drove Lindsey away from Jackson:

> What kind of reckless behavior do you have in this case? We have somebody in a car without somebody seated, without somebody with a safety—with their seatbelt on—pulling out into traffic, presumably with the door half open, still dragging Mr. Jackson along. Okay. Is that recklessness attributable to Mr. Jackson? No.

RP (June 6, 2013) at 545. This argument was not only irrelevant, but it improperly cast aspersions on Lindsey's rescuers' actions. Although the prosecutor may have been a bit overzealous in his response, it was reasonable for the prosecutor to respond to the egregious nature of the defense argument. The jury could independently evaluate whether defense counsel's comments ought to leave one at a loss for words. Jackson fails to demonstrate he was prejudiced by the prosecutor's rebuttal.

B.      Appeals to Passion or Prejudice

Where the defendant fails to object or request a curative instruction at trial, the issue of misconduct is waived unless the conduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). Under this heightened standard, the defendant must show both that "no curative instruction

would have obviated any prejudicial effect on the jury" and that the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." *Thorgerson*, 172 Wn.2d at 455.

It is misconduct for a prosecutor to ask the jury to "decide guilt on something other than the evidence," such as sympathy for the victim. *Moore v. Morton*, 255 F.3d 95, 117 (3d Cir. 2001). Here, the prosecutor argued that Jackson was being tried "because victims of domestic violence need a voice" and "they need someone to stand up for them." RP (June 6, 2013) at 527. The State argues that the prosecutor was merely explaining how Siefert's and Dr. Dahlgren's testimony compensated for Lindsey's failure to testify. But there is a difference between stating that Lindsey *had* a voice (because her statements came in through the testimony of other witnesses), and that she *needed* a voice. By arguing that Lindsey "need[ed] someone to stand up" for her, the prosecutor suggested that the jury should stand up for Lindsey and convict Jackson. RP (June 6, 2013) at 527. This improper argument implied that the jury should convict Jackson for reasons other than the strength of the evidence. However, any prejudice from this statement was cured by the trial court's instruction that "the lawyers' statements are not evidence" but are only "intended to help [the jury] understand the evidence and apply the law." Clerk's Papers (CP) at 78. Jackson fails to meet the heightened *Stenson* standard, and thus he has waived the error.

C.     Burden of Proof

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." *Lindsay*, 180 Wn.2d at 434. Again, because Jackson failed to timely object to the prosecution's comments, the heightened *Stenson* standard applies.

It is misconduct for a prosecutor to trivialize the State's burden of proof by comparing the reasonable doubt standard to everyday decision-making. *Lindsay*, 180 Wn.2d at 436. Here, the prosecutor argued that the jury could be "satisfied beyond a reasonable doubt that the earth is round" based on its "common sense appreciation of the fact." RP (June 6, 2013) at 515.

But the prosecutor's argument was not intended to indicate that Jackson's guilt was as obvious as the fact that the earth is round. Rather, the prosecutor's argument occurred in the framework of explaining what an "abiding belief in the truth of the charge" meant. RP (June 6, 2013) at 514. In context, the prosecutor's argument meant that in order to convict Jackson, the jury needed to be as certain that Jackson was guilty as it was certain that the earth is round. While the prosecutor articulated the reasonable doubt standard poorly, any prejudice could have been cured with a timely objection and a reminder to the jury to apply the reasonable doubt standard as defined in the instructions. Jackson cannot show that the prosecutor's comment was incurable, and Jackson has waived the error.

Similarly, Jackson did not object to the prosecutor's argument that "trying to concoct a scenario where the defendant did not commit this crime would be as unrealistic as trying to concoct a scenario where I am not an attorney." RP (June 6, 2013) at 567. The prosecutor merely stated that Jackson's theory was not credible, without referencing the burden of proof. Because Jackson cannot show that the prosecutor's comment was incurable, Jackson has waived the error. We reject Jackson's claims of prosecutorial misconduct concerning the State's burden.

D.    Cumulative Error

The cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect. *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011). However, this is not such a case. The three

17

errors Jackson complains of were minor in the full context of the prosecution's closing argument. The prosecutor's argument hewed closely to the elements of the crime and repeatedly admonished the jury to obey the instructions and only to convict Jackson if it was convinced beyond a reasonable doubt of his guilt. As a whole, the prosecutor's improper comments did not reflect a flagrant and ill-intentioned attempt to sway the jury using emotion or personal attacks, but were mere fleeting misstatements that do not entitle Jackson to relief. We find no cumulative error.

V. INEFFECTIVE ASSISTANCE OF COUNSEL

Jackson argues that his counsel was ineffective for failing to adequately raise the Confrontation Clause issue in relation to the nurse's and social worker's statements. The State argues that Jackson's counsel was not ineffective because the Confrontation Clause issue was without merit. We agree with the State.

To establish ineffective assistance of counsel, the defendant must prove both that (1) the attorney's performance was deficient and (2) the deficiency prejudiced the defendant. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing *Strickland v. Washington*, 466 U.S 668, 687, 104 S. Ct. 2052, 80 L. Ed 2d 674 (1984); *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel's performance was reasonable. *Kyllo*, 166 Wn.2d at 862.

Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Ineffective assistance of counsel may be analyzed for the first time on appeal if the defendant can show a manifest constitutional error. *McFarland*, 127 Wn.2d at 334; RAP 2.5(a)(3).

As discussed above, the nurse's and social worker's statements were not testimonial and were not subject to the Confrontation Clause. Therefore, Jackson's trial counsel did not err by failing to object more strongly on the Confrontation Clause issue. Expanding on the argument or renewing the objection would have been futile. Jackson fails to show deficiency and we reject his ineffective assistance of counsel argument without reaching the prejudice prong.

## VI. COSTS

Jackson argues, and the State concedes, that the trial court exceeded its authority by requiring Jackson to pay for the domestic violence assessment and to contribute to the expert witness fund and the special assault unit. In addition, Jackson argues that the trial court exceeded its authority by requiring Jackson to pay for the cost of his court-appointed counsel. Jackson further argues that the trial court violated Jackson's right to counsel by ordering him to pay counsel costs without inquiring into whether he had the present or future ability to pay. The State argues that the trial court properly imposed counsel costs on Jackson under the recoupment statute.

We agree with the State on all cost issues. We accept the State's concession and remand to vacate the domestic violence assessment, expert witness fund, and special assault unit costs.[7] However, we affirm the trial court's imposition of counsel costs.

---

[7] As Jackson points out, these costs were improperly imposed because Jackson was not convicted of a crime of domestic violence, Jackson did not use an expert witness, and no statute authorizes the court to require Jackson to pay the Kitsap County special assault unit. The costs were improperly imposed.

19

A.     Authority to Impose Counsel Costs

RCW 10.01.160(1) permits a court to require a defendant to pay costs. These costs "shall be limited to expenses specially incurred by the state in prosecuting the defendant" and may not include "expenses inherent in providing a constitutionally guaranteed jury trial." RCW 10.01.160(2). Jackson argues that the cost of court-appointed counsel is not an expense specially incurred by the State in prosecuting the defendant, and thus the statute does not permit the trial court to require Jackson to pay for the cost of appointed counsel.

Jackson is wrong. As we have held in the past, the cost of court-appointed counsel is one of the two "'*principal* expenses which the state specially incurs in prosecuting an individual defendant.'" *Utter v. Dep't of Soc. & Health Servs.*, 140 Wn. App. 293, 309, 165 P.3d 399 (2007) (quoting *Oregon v. Fuller*, 12 Or. App. 152, 504 P.2d 1393, 1396 (1973), *aff'd*, 417 U.S. 40, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974)) (emphasis added) (internal quotations omitted). Because the cost of Jackson's appointed counsel is an expense specially incurred by the State, the plain language of RCW 10.01.160 allows the court to impose the cost of appointed counsel on Jackson. We reject Jackson's statutory argument.

B.     Ability to Pay

Jackson argues that the trial court unconstitutionally chilled his right to counsel by requiring him to pay for the costs of his court-appointed counsel. We review a claim of a constitutional error de novo. *State v. Edwards*, 171 Wn. App. 379, 387, 294 P.3d 708 (2012).

The government may not "chill the assertion of constitutional rights by penalizing those who choose to exercise them." *United States v. Jackson*, 390 U.S. 570, 581, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968). On the other hand, the Constitution does not mandate that indigent defendants must "remain forever immune from any obligation to shoulder the expenses of their legal defense,

even when they are able to pay without hardship." *Fuller v. Oregon*, 417 U.S. 40, 53-54, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974). It is constitutional for the state to recoup costs from defendants so long as the recoupment statute properly balances these considerations. This means that the recoupment statute must be "tailored to impose an obligation only upon those with a foreseeable ability to meet it, and to enforce that obligation only against those who actually become able to meet it without hardship." *Fuller*, 417 U.S. at 54.

An example of a statute that meets these requirements is the Oregon recoupment statute, OR. REV. STAT. § 135.050(1)(d) (2012). That statute imposes repayment requirements only upon a convicted defendant who "is or may be able to pay them." OR. REV. STAT. § 161.665(1), (4) (2011). It requires the sentencing court to "take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." OR. REV. STAT. § 161.665(4). The defendant may not be required to repay costs if it appears at the time of sentencing that "there is no likelihood that a defendant's indigency will end." *Fuller*, 504 P.2d at 1397. The statute further allows a defendant to petition the sentencing court for remission of his payment obligations. OR. REV. STAT. § 161.665(5). The United States Supreme Court approved of this statute, noting that it is "clearly directed only at those convicted defendants who are indigent at the time of the criminal proceedings against them but who subsequently gain the ability to pay the expenses of legal representation." *Fuller*, 417 U.S. at 46.

Washington has a very similar statute, RCW 10.01.160. That statute also applies only to convicted defendants. RCW 10.01.160(1). It imposes payment requirements only if the defendant "is or will be able to pay them." RCW 10.01.160(3). The statute also requires the sentencing court to "take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." RCW 10.01.160(3). The statute permits a defendant to petition

21

the sentencing court for remission, and in cases of manifest hardship, permits the court to "remit all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170." RCW 10.01.160(4). Our Supreme Court has held that these statutory features satisfy the test delineated in *Fuller*. *State v. Barklind*, 87 Wn.2d 814, 818, 557 P.2d 314 (1976).

The main difference between the Washington statute and the Oregon statute is that the Washington statute does not require the court to make formal and specific findings on the defendant's ability to pay at the time of sentencing, but rather at the time of *enforcement*. *State v. Blank*, 131 Wn.2d 230, 238-242, 930 P.2d 1213 (1997). Jackson argues that this distinction makes RCW 10.01.160 constitutionally deficient. Our Supreme Court has consistently rejected this argument. *Blank*, 131 Wn.2d at 242; *State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992). Other state and federal courts interpreting similar recoupment provisions have rejected this argument as well. *See, e.g. United States v. Hutchings*, 757 F.2d 11, 14-15 (2d Cir. 1985); *Alaska v. Albert*, 899 P.2d 103, 112 (Alaska 1995); *North Dakota v. Kottenbroch*, 319 N.W.2d 465, 473 (N.D. 1982); *Ohio v. McLean*, 87 Ohio App. 3d 392, 622 N.E.2d 402, 404 (1993); *Basaldua v. State*, 558 S.W.2d 2, 6-7 (Tex. Ct. App. 1977).

The insight that these courts relied on, and that Jackson's analysis overlooks, is that the Supreme Court did not hold that *every single element* of Oregon's statute was constitutionally required. That is, the features of the Oregon recoupment statute were sufficient, but not necessary. What matters is that "the defendant is entitled to free counsel when he needs it, and the fact that he knows he may have to repay the costs of the services does not affect his eligibility to obtain counsel." *Blank*, 131 Wn.2d at 236; *see also Fuller*, 417 U.S. at 53.

22

This case is no different from the challenges to our recoupment statute our Supreme Court previously rejected. Jackson received counsel "'when he need[ed] it'—that is, during every stage of the criminal proceedings against him." *Fuller*, 417 U.S. at 53 (quoting *Fuller*, 12 Or. App. at 158-59). And there is nothing on the record to suggest that Jackson's knowledge "that he might someday be required to repay the costs of these services . . . affects his eligibility to obtain counsel." *Fuller*, 417 U.S. at 53. Like the Oregon statute, our recoupment statute is tailored to "insure that only those who actually become capable of repaying the State will ever be obliged to do so." *Fuller*, 417 U.S. at 53. This is because the court must determine whether the defendant can pay "before enforced collection or any sanction is imposed for nonpayment." *Blank*, 131 Wn.2d at 242. That is, by interposing a formal inquiry and opportunity to be heard before the defendant is *actually* required to pay, RCW 10.01.160 employs adequate safeguards to avoid chilling the right to counsel. *Blank*, 131 Wn.2d at 245. The statute is sufficiently tailored to "*enforce* [a repayment] obligation only against those who actually become able to meet it without hardship," and Jackson's constitutional challenge fails. *Fuller*, 417 U.S. at 54 (emphasis added). The costs order does not constitute a manifest constitutional error and should not be considered here. RAP 2.5(a)(3).

Finally, Jackson, citing RPC 1.5(b), raises a cursory equal protection argument in a footnote—he argues that it is unfairly discriminatory that an indigent defendant is not apprised of fees and costs prior to appointment of counsel, when ordinarily counsel must make such disclosure in advance. We do not reach this claim because it is inadequately briefed and unsupported by citation to the record or authority. *See Bohn v. Cody*, 119 Wn.2d 357, 368, 832 P.2d 71 (1992); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a)(6). *See also Blank*, 131 Wn.2d at 245 (equal protection argument that failed to articulate

which level of scrutiny applied was "inadequately presented"). The recoupment statute is constitutional.

We accept the State's concession and remand with instructions to vacate the domestic violence assessment costs and the contributions to the expert witness fund and special assault unit. In all other respects, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, J.

Bjorgen, A.C.J.